82 So.2d 181

**John R. NELSON et al.**

v.

**MOBILE BAY SEAFOOD UNION et al.**

1 Div. 607.

Supreme Court of Alabama.

Aug. 18, 1955.

Howell & Johnston, Mobile, for appellants Nelson.

John Patterson, Atty. Gen., and A. J. Harris, Asst. Atty. Gen., for appellant Department of Conservation.

M. A. Marsal, Mobile, for appellees.

MERRILL, Justice.

This is an appeal from a decree of the Circuit Court of Mobile County, in Equity, which granted a permanent injunction against the original respondents, John R. Nelson and John A. Nelson, enjoining them from further dredging for seed oysters from a public reef located in Mobile Bay called White House Reef. Appellees (complainants below) are a group of oystermen residing in the vicinity of Mobile Bay. Appellants consist of the original respondents, who are permittees of the Director of the

Alabama Department of Conservation, and the Director of the Department of Conservation, as Intervenor. As hereinafter referred to "permittees" will have reference to the original respondents and "the director" will have reference to the Intervenor.

On April 24, 1954, the permittees were issued a license by the director authorizing them to take seed oysters for replanting purposes from a designated portion of White House Reef by means of an oyster dredge. They were so engaged in dredging for seed oysters when appellees filed for and the court granted a temporary injunction prohibiting further dredging on the oyster reefs in Mobile County. Permittees and the director filed a motion to dissolve said injunction on the 14th day of May. On the 21st of May appellees filed an amendment to their original petition whereupon the appellants filed a motion to strike the amendment. This motion was denied. On May 22 the court denied appellant's motion to dissolve the injunction and on the same date issued the permanent injunction from which this appeal is prosecuted.

The evidence adduced, which was heard ore tenus by the judge, was conflicting. Appellants sought to prove that dredging in the manner done and under the supervision furnished was not harmful to the oysters or oyster reefs. Appellees offered no substantial testimony tending to rebut the allegation and proof of appellants that the dredging operation had been conducted under the continuous supervision of employees of the Department of Conservation and that permittees had at all times strictly complied with the terms and conditions embodied in the permit issued by the director.

Appellants called four expert witnesses, the Scientific Advisor to the Mississippi Seafood Commission; a marine biologist employed by the United States Department of the Interior, Fish and Wildlife Service Branch of Fishery Biology; a research biologist with Texas A&M College, and the marine biologist employed by the Seafoods Division, Alabama Department of Conservation. These experts, shown to have personal knowledge of the oyster reef upon which these dredging operations had been conducted, testified that the permit issued by the director provided such rules and regulations as would protect the reef and the oysters thereon. These same expert witnesses testified that they considered it practical and advisable to dredge oysters from the White House Reef for replanting purposes. They further testified that results of tests made on the reef both during the dredging operations and after the cessation thereof disclosed that no harm had been done to the oyster reef. Appellants also adduced evidence to the effect that because of adverse weather conditions generally prevailing on the portion of White House Reef allowed to be dredged and because of the depth of the water on the reef, tonging for oysters was not a practical method of taking oysters therefrom.

Witnesses for the appellees consisted primarily of experienced oystermen, men who had earned all or part of their livelihood from oyster fishing. The substance of their testimony was to the effect that the taking of oysters by use of an oyster dredge destroys the oyster reef and causes death to the oysters; that at the time of the dredging here in question the oysters were spawning and as a result were in a weakened condition and easily killed; that a major portion of all oysters taken or harvested in Mobile County come from the White House Reef; that oysters may satisfactorily and practically be taken from said reef by use of tongs which cause no harm to the reefs or oysters; that prior dredging operations on White House Reef caused great harm to the reef and oysters; that the White House Reef is a mother reef which furnishes spawn to smaller reefs in its vicinity; that destruction of the mother reef results in lack of sufficient spawn to other reefs; and that the dredging operations conducted by permittees was causing destruction of reef and oysters.

■ Since, as before stated, the evidence supports a finding that permittees were acting within the limits of and under the authority conferred upon them by the director, our determination here resolves itself to the question whether the director could validly confer such authority. If it be determined that the issuance of the per-

mit to permittees was a valid exercise of authority by the director, it must follow that the permittees should not have been enjoined.

There are several sections of our code which pertain to the powers, duties, etc., of the Department of Conservation and the Director thereof in regard to seafoods. Some of the sections, as applicable here, are as follows:

Title 8, § 4, Code of Alabama, 1940, provides:

"Jurisdiction and authority over seafoods, etc. The department of conservation shall have full jurisdiction and control of all sea foods existing or living in the waters of Alabama, and of all public and natural oyster reefs and oyster bottoms of the State of Alabama, and it shall ordain, promulgate and enforce all rules, regulations and orders deemed by it to be necessary for the protection, propagation or conservation of same; the department may by order duly made and published prescribe the manner of taking or catching, the time when, and designate the places from which sea foods may or may not be taken or caught, during certain periods of the year, or entirely, as it may deem to be for the best interest of the sea food industry. It shall have full authority to prohibit the catching or taking of oysters from reefs designated by it by order duly made and promulgated during the entire open season or any part thereof, and may open and close said reefs or portions thereof to tonging or dredging, or both, and at any time deemed by it to be to the best interest of the public welfare. It shall receive and audit the accounts of oysters bought and caught of all canners and dealers, and the accounts of all inspectors, employees and members of said department, and of all expenses incident to carrying into effect this title, and shall see that all privilege taxes and license fees are paid, that the inspectors and other officers and employees faithfully discharge their duties, and that all provisions of this title are properly complied with and enforced, and the director shall hear the complaints of any person aggrieved by the action of any officer. It shall have authority to cooperate with the commissioner of the bureau of fisheries of the department of commerce of the United States government in the carrying out of the provisions of any act of congress for the sale, distribution or propagation of all sea foods and the extension of the producing areas thereof. It shall have authority to make rules and regulations requiring all catchers, factories, purchasers, dealers or any persons dealing in shrimp and oysters to make reports to the department, containing the number of barrels caught or sold, and any other information said department may require; to designate the dates for opening and closing of the seasons for catching shrimp and the waters from which the same may be taken. To cause surveys to be made of the coastal regions of the State of Alabama for the purpose of determining the economic soundness of the development of the oyster industry in the location; to make plans and estimates of the cost of such developments and improvements and in connection therewith to enter on any lands, waters, and premises for the purpose of making such surveys, soundings and examinations."

Title 8, Section 6, Code of Alabama, 1940, provides, in part:

"The director of conservation shall have all power and authority necessary or convenient to carry out the functions and duties of the department of conservation."

Title 8, Section 17, Code of Alabama, 1940, provides, in part, as follows:

"The director of conservation is hereby vested with the power to enforce and administer all laws providing for the preservation, protection, propagation, and development of wild birds, wild fur-bearing animals, game fish, salt-water fish, shrimp, oysters, and other shell-fish, crustaceans, and

all other species of wild life within the state, or within the territorial jurisdiction of the state, which have not been reduced to private ownership, except as otherwise provided. The director of conservation is empowered: * * * to regulate the manner, means, and devices for catching, or taking game fishes, game birds, game and fur bearing animals, and the manner, means, and devices for catching or taking all other species of fish not designated as game fish; * * *."

Title 8, Section 112, Code of Alabama, 1940, quoted in full is as follows:

"All sea foods existing or living in the waters of Alabama not held in private ownership legally acquired, and all beds and bottoms of rivers, streams, bayous, lagoons, lakes, bays, sounds, and inlets bordering on or connecting with the Gulf of Mexico, or Mississippi Sound, within the territorial jurisdiction of the State of Alabama including all oysters, and other shell fish and parts thereof, grown thereon, either naturally or cultivated, shall be, continue, and remain the property of the State of Alabama, to be held in trust for the people thereof, until title thereto shall be legally divested in the manner and form hereinafter authorized, and the same shall be under the exclusive control of the department of conservation until the right of private ownership shall vest therein as hereinafter provided."

Title 8, Section 139, Code of Alabama, 1940, as amended, provides in part:

" * * * Owners of private reefs, beds or bottoms and lessees from the state of Alabama of public reefs, beds or bottoms may take and catch by dredge or otherwise from the public reefs, beds or bottoms unculled oysters to be used as seeds for the purpose of establishing or enlarging private reefs, beds or bottoms, which said unculled oysters must thereupon be replanted by the person, firm, corporation or association taking or catching same. Such seed oysters may be

taken at any time from such public reefs, beds or bottoms between January 1st of each year and the date fixed by the department of conservation as the closing date for the taking and catching of oysters for such year, but under the supervision of the department of conservation, and after written notice shall have been given the department of conservation by the person, firm, corporation or association desiring to take such oysters. * * *."

Title 8, Section 140, Code of Alabama, 1940, quoted in full, is as follows:

"Every dredge authorized to be used in catching or removing oysters from the public reefs, beds or bottoms of this state shall be licensed by the department of conservation. Before such license is issued the applicant shall pay to the department of conservation or its duly authorized agent a fee of twenty-five dollars for each and every dredge used in taking or catching oysters. The license so issued shall be dated and shall be effective only for the season issued and then only in a manner and place and at a time under regulations and authority of the department of conservation."

Obviously, these quoted sections recognize that dredging under the license and supervision of the department of conservation is an approved manner for taking or catching seed oysters. We think these sections manifest the intention of the legislature to grant to the department of conservation the power and duty to promote and preserve the seafood industry. As a necessary incident to the effectuation of the purpose for which established, the legislature recognized that the department of conservation would rely to some extent on the advice and opinions of men who are recognized experts in the field of oyster culture. Such advice and opinions may furnish the best guide to effective propagation and conservation of the seafood industry.

Pursuant to the authority granted to him by law and in the exercise of judgment which was based, at least in part, on the

advice of experts in the field of marine biology, the director issued the permit here in question. We said in the case of Carson Cadillac Corp. v. City of Birmingham, 232 Ala. 312, 167 So. 794, 798:

"It is well-settled that courts of equity, in the absence of fraud or gross abuse, will not interfere with the exercise of discretion by administrative boards in the determination of the necessity and requirements of public accomplishment, much less control the judgment of such boards in respect to matters within the technical field of their duties and powers."

In the case of Salter v. Board of Education of Jefferson County, 229 Ala. 631, 159 So. 78, 79, it was said:

"Broadly speaking, a court of equity may, in the absence of any adequate legal remedy, interfere for the protection of persons against the acts of administrative agencies infected with fraud or bad faith, or a gross and palpable abuse of discretion." (Citing authorities.)

Here there is no question of fraud or bad faith but appellees contend that dredging will cause irreparable injury to the oyster industry in Mobile County. We have said that the evidence is conflicting on this point. We are not persuaded that any injury accompanies the dredging which was being done by permittees. In fact, there was substantial testimony to the effect that the operations would prove beneficial. We think the language of this court in the case of Goodwin v. State Board of Administration, 212 Ala. 453, 102 So. 718, 719, finds application here: "Equity will not intervene while public officers are acting within the authority conferred on them by law, to determine whether their action is good or bad."

In the case of Huddleston v. Humble Oil Refining Co., 260 Ala. 384, 71 So.2d 39, 43, we said:

" * * * But the courts will not grant a mandatory injunction nor a restrictive injunction against the director or Governor when to do so would involve a review of their judgment which is not patently arbitrary. State ex rel. Turner v. Henderson, 199 Ala. 244, 74 So. 344, L.R.A.1917F, 770; State ex rel. Daly v. Henderson, 199 Ala. 428, 74 So. 951; Board of Revenue v. Merrill, 193 Ala. 521, 69 So. 971; Citizens' Bank & Security Co. v. Commissioners' Court, 209 Ala. 646, 96 So. 778; O'Rear v. Sartain, 193 Ala. 275, 69 So. 554.

" * * * So that in this case, as to the Governor as well as the director of the department of conservation, our authority ends when it is found that what complainant is seeking is to direct the manner in which the Governor or director shall exercise his judgment or discretion."

While it is true that a court of equity, in cases otherwise proper, will grant injunctive relief to prevent irreparable injury, the proof of such injury must clearly and convincingly appear. As was stated in the case of English v. Progress Electric Light & Motor Co., 95 Ala. 259, 10 So. 134, and quoted with approval in Jones v. Jefferson County, 203 Ala. 137, 82 So. 167, 168:

" 'By the settled rule in this state a case must be proved which establishes the necessity of a preventive remedy—a case within that class of cases of irreparable or continuous injury which can be adequately redressed only by injunction; and in all cases where the right is doubtful, and the exercise of the power would interfere with industries promotive of public utility, it becomes the duty of the court to abstain from interfering. In such cases the proof should be clear and convincing, and the power "should be cautiously and sparingly exercised." ' "

Appellees make the following statement in brief:

"The complainants proved the following:

"1. Dredging is harmful to oysters.

"2. The oysters were spawning at the time of the dredging.

"3. The oyster is the weakest during the spawning season.

"4. Oysters can be tonged satisfactorily from the White House Reef."

Each of these four points were contested by appellants and probably the more credible testimony was counter to each of them, but, assuming the matters were proven, still the injunction should not have been issued in view of the authorities cited supra.

The effect of the injunction issued by the court below was to prohibit that which is by statute left to the judgment and discretion of the director of the department of conservation. The pleadings and proof fail to establish that such judgment or discretion was improperly exercised.

The decree appealed from is reversed, and one is here rendered dismissing the appellees' bill and dissolving the injunction.

Reversed and rendered.

LAWSON, GOODWYN and MAYFIELD, JJ., concur.